23CA1393 Peo v Poloa 08-13-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1393
El Paso County District Court No. 22CR2414
Honorable Jessica Curtis, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mikaele Jushawn Poloa,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Gomez and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Lauretta A. Martin Hillier, Alternate Defense Counsel, Montrose, Colorado, for
Defendant-Appellant

¶ 1     Defendant, Mikaele Jushawn Poloa, appeals his convictions for attempted second degree murder, illegal discharge of a firearm, and reckless endangerment, asserting that his constitutional right to a fair and impartial jury under *Batson v. Kentucky*, 476 U.S. 79 (1986), was violated.  We affirm.

¶ 2     Poloa contends that the trial court violated his right to equal protection of the law by allowing the prosecution to dismiss Juror R, a person of color, with a peremptory strike.  We remanded the case for the trial court to make step-three *Batson* findings.  *People v. Poloa*, (Colo. App. No. 23CA1393, Aug. 6, 2025) (unpublished order).  Having now received the court's factual findings, we discern no error in its ruling.

## I.     Background

¶ 3     Late one night, the victims, A.H. and R.H., were awakened by loud noises coming from a neighboring apartment.  R.H. knocked on the shared wall, and the exchange escalated to louder knocking and yelling by both sides.  Eventually, A.H. and R.H. heard a knock at their door.  Fearing for his safety, A.H. grabbed a gun and looked through the peephole in his front door.  He saw the codefendant, who was also armed.

¶4     A.H. opened the door with his gun drawn, and the codefendant ran down the hall.  Poloa, who had been standing farther down the hall, fired a shot at A.H., after which A.H. fired three shots in Poloa's direction and ducked back into his apartment.  R.H. then called 911.

¶5     The incident was captured on surveillance video and showed that Poloa fired his gun first.  Although Poloa did not testify at trial, the prosecution introduced his statement to the police explaining that he and his friends believed R.H. was being assaulted after hearing her scream, so they came to her aid.

## A.     Jury Selection

¶6     The prosecutor's first interaction with Juror R occurred when the prosecutor asked who, if selected as a juror, would want to read the police reports.  Juror R raised her hand.  When asked when and why she would like to see the reports, Juror R responded, "When you listen to the parties in the case, so you can make sure that the report matches up with what they said."

¶7     Later, the prosecutor asked the prospective jurors about memory — namely, whether memory improves or worsens over time and what things affect memory.  Juror R agreed with another juror

that stressful events can affect memory, saying, "I believe that, because it can be based on emotions. Like she said, the stress of it, the intensity of it at that moment."

¶ 8    Finally, the prosecutor questioned the jurors about self-defense. While most agreed that it was okay to use force to defend a home or a business, Juror M disagreed in the following exchange:

> [JUROR M]: Homes and businesses can be replaced but human life cannot, so I don't necessarily think — there's a time and place for everything, but in the culture that we live in in the United States where guns rule everything, I don't agree with force, deadly force, for any reason unless it's absolutely necessary to defend yourself or your family.
>
> [PROSECUTOR]: So you don't agree with deadly force unless it's absolutely necessary to defend your family. Okay. And does anyone — [Juror R], do you agree with that statement?
>
> [JUROR R]: I agree with that statement.

¶ 9    During the defense's voir dire, defense counsel asked Juror R about her work as a paralegal in Mississippi and whether that work left a bad taste in her mouth about jury trials or the criminal justice system. Juror R responded no. Counsel then turned to the issue of self-defense:

[DEFENSE COUNSEL]: So, [Juror R], going back to my questions and to your neighbors, what kind of factors would you look for before kind of making a decision that something was in self-defense if there was deadly force used?

[JUROR R]: If it was deadly force used?

[DEFENSE COUNSEL]: Uh-huh.

[JUROR R]: With a gun or whatever? Like back to what [the other jurors] were saying, the location of it, you know, the reason, is [the gun] pointing directly at me. Some people — like it might could [sic] be a warning shot, so if somebody shoot [sic] up in the air, you know, but if I feel threatened and [the gun is shot] right at me, then yes.

[DEFENSE COUNSEL]: So you're okay with the idea [of deadly force used in self-defense]?

[JUROR R]: Exactly.

¶ 10    The prosecutor exercised his third peremptory challenge to strike Juror R.[1] Defense counsel objected under *Batson*, noting that Juror R was "one of two or three people of color" in the jury pool, for a case where the defendant was also a person of color.

---

[1] The prosecutor also struck Juror M.

4

¶ 11     The court asked if the prosecutor had a race-neutral explanation for excusing Juror R and the prosecutor responded:

> So previously [Juror M] was questioned.  They indicated that they do not believe that force can be used to defend your home or business since those are both things that can be replaced.  [Juror M] also indicated that he does not believe in deadly force for any reason, unless it is absolutely necessary to defend yourself.  And [Juror R] agreed with all of those statements.
>
> The issue here is we have a victim who is, from the People's perspective, defending their home from an armed intruder, so [Juror R]'s belief that she would not under that circumstance find the victim's actions appropriate would be prejudicial against the People's case.

¶ 12     At step three, defense counsel first argued that this case was not about defense of property and that self-defense was not the prosecution's theory of the case.  The trial court found that Juror R's agreement with Juror M could reasonably be interpreted as "not full-throated endorsements of an individual's right to exercise deadly force."  It further found that whether the statements related to an individual's right to use deadly force to defend a person or property, the prosecution could reasonably view them as

problematic for its case and, as a strategic matter, could wish to eliminate such views from deliberations.

¶ 13    Defense counsel next argued that the court's comments about one of the prosecutor's interpretations of case law at an earlier hearing in the case bore on the credibility of the prosecutor's reason for excusing Juror R.  While the court agreed that it had criticized the prosecutor's legal interpretation, it found that its comments reflected more on the prosecutor's analytical skills than on credibility and that it found the prosecutor to be "generally candid, credible and professional."  It then concluded that the defense had failed to establish purposeful discrimination.

### B.    Standard of Review and Applicable Law

¶ 14    The Equal Protection Clause of the Fourteenth Amendment precludes a juror challenge based on race.  *Batson*, 476 U.S. at 89.  "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure."  *Id.* at 86.

¶ 15    *Batson* provides a three-step process for evaluating claims of racial discrimination in jury selection.  *People v. Ojeda*, 2022 CO 7, ¶ 21.  First, the opponent of a peremptory strike must make a

prima facie showing that the proponent used the strike against a potential juror because of race. *Id.* at ¶ 22. As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied their step-one burden. *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).

¶ 16    At step two, the proponent of the strike "must come forward with a race-neutral explanation 'related to the particular case to be tried.'" *Ojeda*, ¶ 23 (quoting *Batson*, 476 U.S. at 98). The striking party may "provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness." *Id.* at ¶ 24.

¶ 17    Then, at step three, the opponent may rebut the proponent's explanation, and the court must determine "[w]hether the objecting party has established purposeful [racial] discrimination." *Id.* at ¶ 27. "In assessing the credibility of the proponent of the strike, the court may consider a number of factors, including the proponent's demeanor, how reasonable or improbable the proponent's explanations are, and whether the proffered rationale has some basis in accepted trial strategy." *People v. Collins*, 187 P.3d 1178, 1182 (Colo. App. 2008). For a *Batson* challenge to succeed, the

7

court must "find by a preponderance of the evidence that one or more potential jurors were excluded because of race." *Valdez*, 966 P.2d at 590.

¶ 18 Different steps of the *Batson* analysis are subject to separate standards of review. *Ojeda*, ¶ 30. We review steps one and two de novo. *Id.* For step three, the trial court's final determination as to the existence of racial discrimination is an issue of fact that we review for clear error. *Id.*; *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). We defer to the trial court's step-three ruling "so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion" regarding purposeful discrimination. *Ojeda*, ¶ 42 (quoting *People v. Beauvais*, 2017 CO 34, ¶ 32).

## C.    Analysis

¶ 19 Concerning step one, the trial court determined, and we agree, that defense counsel made a prima facie showing that the prosecutor's peremptory strike was racially motivated because the record shows that Juror R was a person of color in a jury pool with only one or two other people of color and Poloa is a person of color. Thus, step one is satisfied.

¶ 20    Regarding step two, we agree with the trial court that the prosecutor provided a race-neutral explanation for excusing Juror R.  The record shows that Juror R agreed with Juror M's statement that deadly force should not be used to protect a home or business because those things are replaceable.  In our view, this explanation constitutes a sufficiently race-neutral reason to satisfy step two. *See id.* at ¶ 24.

¶ 21    Concerning step three, we conclude that the court findings are supported by the record.  The record shows that Juror R agreed with Juror M that deadly force was unreasonable to use in defending structures, and it supports the court's findings that these statements could reasonably have been viewed by the prosecution as a broader concern with the use of deadly force.  Thus, the statements formed a reasonable basis for the prosecution to strategically remove Juror R with a peremptory challenge and support the court's finding that the excusal "appeared to be genuine litigation strategy on behalf of the prosecution."

¶ 22    Additionally, we agree with the trial court that its earlier comments concerning one of the prosecutor's interpretations of case law does not constitute a credibility finding but, instead, reflects a

9

critique of the prosecutor's analytical skills. Indeed, the court found the prosecutor to be credible, a finding supported by the fact that the prosecutor's race-neutral explanation was consistent with the jurors' responses.

¶ 23     Accordingly, we discern no constitutional violation in the excusal of Juror R.

## II.     Disposition

¶ 24     The judgment is affirmed.

JUDGE GOMEZ and JUDGE MEIRINK concur.